# United States Court of Appeals

## For the First Circuit

No. 01-2134

UNITED STATES OF AMERICA,

Appellee,

v.

BASILIO RIVERA-RODRÍGUEZ,

Defendant, Appellant.

_____

No. 01-2315

UNITED STATES OF AMERICA,

Appellee,

v.

OSCAR E. TRINIDAD-RODRÍGUEZ,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

_____

Before

Boudin, Chief Judge,

Howard, Circuit Judge,

and Shadur,* Senior District Judge.

_____

Armando Porrata-Doria with whom Nicolas Nogueras, Jr. was on

_____

*Of the Northern District of Illinois, sitting by designation.

brief for appellant Basilio Rivera-Rodríguez.

        Wayne C. Raabe, Department of Justice, Criminal Division, Narcotic and Dangerous Drug Section, for the United States.

        Kenneth I. Seiger, by appointment of the court, for appellant Oscar Trinidad-Rodríguez.

        Wayne C. Raabe, Department of Justice, Criminal Division, Narcotic and Dangerous Drug Section, for the United States.

_____

January 29, 2003

_____

**BOUDIN, Chief Judge**.  In this decision, we address the appeals of Basilio Rivera Rodriguez ("Rivera") and Oscar Trinidad Rodriguez ("Trinidad") who were convicted along with Elena Corchado Peralta of conspiring to launder money.  18 U.S.C. §§ 1956(a)(1)(B) and (h) (2000).  The principal conspirator was Corchado's husband, Ubaldo Rivera Colon ("Colon"), a drug dealer who was the source of the laundered funds, and who pled guilty and testified at the joint trial.  The Rivera and Trinidad transactions have some resemblance to each other but are quite distinct from those of Corchado, see whose appeal is addressed in a separate decision.

At the outset, both Rivera and Trinidad challenge the sufficiency of the evidence.  Because the jury convicted, we describe the evidence for purposes of this claim of error in the light most favorable to the government.  United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001).  Colon himself was a major drug dealer who earned several million dollars in profits smuggling cocaine into Puerto Rico during the period between 1987 and 1996.  Rivera and Trinidad are accused only of participating in transactions to launder the proceeds.

As the indictment was framed, the government had to show that each defendant:

> 1.    conducted    "a    financial transaction" involving the proceeds of some form of unlawful activity, "knowing"  that the proceeds were thus tainted; and

-3-

> 2. knew that the transaction was "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds . . . ."

18 U.S.C. § 1956(a)(1). The defendant is not required to know what type of felony spawned the proceeds but only that some felony did so. Id. § 1956(c)(1). And "knowledge" can be established by showing that a defendant was "wilfully blind" to facts patently before him. See United States v. Frigerio-Migiano, 254 F.3d 30, 35 (1st Cir. 2001)

Trinidad. We begin with Trinidad, who engaged with Colon in several transactions related to speedboat purchases. In 1994, Trinidad, who raced speedboats, was introduced to Colon, who was also a speedboat enthusiast. Colon and Trinidad testified that at this meeting Colon held himself out as a legitimate car and cattle businessman. As a result of their meeting, Colon suggested that they purchase an expensive speedboat, Budweiser, as a joint venture.

In May 1994, Colon took $100,000 from a hiding place on a cattle farm and gave it to Trinidad. Trinidad then gave two associates $18,000 of the money to purchase two manager's checks apiece from different banks in the amount of $9,000 each. Trinidad himself also purchased manager's checks in approximately the same amount from two different banks. These checks totaling $36,000, along with other funds contributed by Colon totaling $100,000, were

-4-

deposited in a boat merchant's bank account, and were used to buy Budweiser.

The title of the boat eventually was placed in Trinidad's name. Trinidad testified that it was placed in his name because the two of them had a sports partnership. Trinidad, however, put up no money for the purchase of the speedboat, and it was Colon alone who later decided to sell it. However, during a tax investigation, Trinidad falsely told local agents that he had paid for the boat.

Trinidad also aided Colon in similar transactions. On at least one occasion, he carried $200,000 in cash to Florida as part of the purchase of another speedboat for Colon. (Trinidad testified that although he knew he was carrying cash for Colon, he did not know the amount). Colon also gave Trinidad over $60,000 in cash to pay for boat maintenance and parts. Trinidad also assisted Colon in the latter's unsuccessful attempt to buy a South Florida apartment for cash.

On appeal, Trinidad concedes that the evidence sufficed to show that he knew the transactions he took part in were designed to conceal the source of the funds involved; the size of the cash transactions together with the use of $9,000 deposits, just under the limit for bank reporting, see 31 C.F.R. § 103.22(b)(1) (2002), bears this out. However, he disputes whether a reasonable jury could find that he knew that transactions involved illegal

proceeds.  His primary argument is that he did not know that Colon had been a drug dealer.

Under the statute, it would be enough if a jury could conclude that some felony--drug dealing is merely the most obvious candidate--was so obviously the source that Trinidad had to know it.  18 U.S.C. § 1956(c)(1).  Indeed, because governing law equates willful blindness with knowledge, Frigerio-Migiano, 254 F.3d at 35, it would suffice for the jury to conclude that Trinidad consciously averted his eyes from the obvious explanation for the funds; he did not have to witness drug dealing or hear a confession.  And the jury was free to draw common-sense inferences from the nature of the transactions and efforts to conceal.

Here, Colon engaged in very large cash transactions involving Trinidad (the initial purchase and the Florida delivery) and more than one such venture occurred.  With Trinidad's help, Colon patently splintered the deposits to amounts just under $10,000, a step serving only to avoid bank reporting.  And Colon placed the boat in Trinidad's name even though Trinidad had contributed nothing.

Sometimes one of these red-flag events--cash, concealment, false ownership--can occur even with lawfully derived income (e.g., to foster tax evasion or the concealment of income from a spouse).  But taken together, the pattern was surely that of an effort to launder illegally obtained proceeds, or at least a

jury could reasonably so conclude.  The case law is consistent with this view.  See United States v. Hurley, 63 F.3d 1, 12 (1st Cir. 1995), cert. denied, 517 U.S. 1105 (1996); United States v. Carr, 25 F.3d 1194, 1203 (3d Cir. 1994); cert. denied, 513 U.S. 939 (1994).

After his conviction, the court sentenced Trinidad to 63 months' imprisonment.  In computing the offense level, the court imposed a six-level upward adjustment under U.S.S.G. section 2S1.1 because it determined that Trinidad was responsible for the entire amount of money laundered by Colon's conspiracy.[1]  The court also denied a downward departure for aberrant behavior under U.S.S.G. section 5K2.20 on the ground that Trinidad did not meet the requisite criteria for such a departure.  After challenging both of these rulings in the lower court, Trinidad appeals them here.

We begin with the upward adjustment.  The sentencing guidelines provide that the offense level for money laundering convictions be calculated with reference to the amount of money laundered.  U.S.S.G. § 2S1.1.  In a conspiracy, the amount attributed to a defendant includes not only that which he handled but also the amount he could reasonably have foreseen would be laundered through the conspiracy.  See United States v. White, 116

_____

[1]The 2000 edition of the guidelines was in effect at the time of Trinidad's sentencing, and thus they control our decision here. See United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990) (guidelines in effect at time of sentencing control unless Ex Post Facto considerations prohibit their use).

F.3d 948, 951 (1st Cir. 1997); U.S.S.G. § 1B1.3(a)(1) (2000). At the sentencing hearing, the trial court determined that Trinidad could reasonably have foreseen the entire amount of funds laundered by the conspiracy, U.S.S.G. § 1B1.3, which was in excess of $2 million, warranting a six-level increase in Trinidad's base offense level. See U.S.S.G. § 2S1.1(b)(2)(G).

At the sentencing hearing and on appeal, Trinidad has argued that he could have reasonably foreseen only the amount of money implicated in the transactions in which he actually took part, about $330,000, which would merit only a two-level increase. U.S.S.G. § 2S1.1(b)(2)(C). The court's determination of the amount of money attributable to Trinidad is a factual finding that we review for clear error. United States v. Alicea, 205 F.3d 480, 485 (1st Cir.), cert. denied, 531 U.S. 909 (2000). The government has the burden of showing by a preponderance of the evidence that Trinidad could have reasonably foreseen the funds attributed to him. Id.

At the hearing, the court ruled that the full amount was foreseeable:

> [I]t would seem to me that it would not be unreasonable for Mr. Trinidad to see all the amounts of money being floated around to inquire a little deeper into [Colon's] activities and it would seem to me that from the testimony of [Colon], his car dealership and his farm were just shams, fronts to be able to participate in all the laundering activities that he did. So, I think that he

> [Trinidad] is responsible for the amount of money involved in the whole conspiracy . . . .

Admittedly, Trinidad was convicted of participating in a single money laundering conspiracy with Colon, Corchado, Rivera and others. But this was obviously one of those so-called single conspiracies in which Colon remained the constant and most other participants came and went and engaged in specific transactions without any agreement on an overall amount of money to be laundered. The jargon calls this a hub and spoke conspiracy (Colon being the hub and the others being spokes) but with the added complications of discontinuous transactions and changes in membership over time.

The money laundering guideline gives no clue as to how to decide how much of the conspiracy's laundering to attribute to any individual member. This task is left to the relevant conduct guideline which, in a nutshell, makes this the sum of two figures: (1) how much was involved in transactions in which Trinidad participated (regardless of whether he knew the exact amount), and (2) the amounts he reasonably foresaw would be handled in other transactions undertaken as part of the same "jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1). Our concern here is with the latter figure.

There is no direct evidence cited to us--in the pre-sentence report, in the district judge's findings, or even in the government's brief--that Trinidad was aware of <u>any</u> money laundering

transactions beyond those in which he participated. Indeed, the only useful information on this score from the government was furnished at oral argument where it reported that Trinidad had introduced Rivera to Colon and also given Rivera some helpful deposition testimony in a civil case.[2] But it would be quite a leap to conclude even by a preponderance of the evidence that Trinidad therefore knew anything about specific transactions that Rivera had handled, let alone those handled by others.

From the district judge's remarks we think that he probably had in mind a different theory, namely, that Trinidad must have conceived from the scale of Colon's expenditures in the Trinidad-related transactions, and from whatever Trinidad could see of Colon's style of life, that Colon's drug proceeds and therefore his laundering operations must have extended well beyond the few transactions in which Trinidad was employed. In effect, the district judge was saying, we think, that Trinidad should not have been surprised to find that Colon was laundering at least $2 million. This may well be a defensible judgement.

However, given the lack of evidence, we are not confident from the district judge's remarks that he was distinguishing

---

[2]The trial transcript indicates only that Trinidad had worked as a boat mechanic for Rivera and that he introduced Colon to Rivera, possibly at a boat race in which Rivera and Colon were both involved. The false statement referred to is an affidavit offered by Trinidad in support of Rivera in a civil case in which the latter was a plaintiff.

between Colon's operations as a whole and the foreseeable "jointly undertaken" money laundering--which, alone, is Trinidad's responsibility.  U.S.S.G. § 1B1.3(a)(a).  If Trinidad knew that others were engaged in the same time frame in performing similar transactions for Colon, that would go very far to satisfy this concern.  Perhaps there is some such evidence or other evidence that would suggest that Trinidad had some notion of the full scope of his own conspiracy.  But the government has not pointed us to this evidence and we will not simply assume that it exists.

Admittedly, Trinidad is not attacking here the jury's implicit finding of a single conspiracy--a concept so vague and relaxed under governing case law that attacking it would be difficult.  See United States v. Martinez-Medina, 279 F.3d 105, 113-14 (1st Cir.), cert. denied, 122 S. Ct. 2608 (2002).  But foreseeability does not delimit the scope of a conspiracy, which may extend to activities quite unknown to a low-level participant-- and thereby result in joinder, admission of hearsay, and other conventional consequences.  See id. at 113 & n.3.  Under conspiracy law, it is only one's substantive liability for the crimes of other conspirators that depends on a foreseeability test, see Pinkerton v. United States, 328 U.S. 640, 645-48 (1946). No Pinkerton instruction or amount findings were involved in this case so we have no idea what amounts from other transactions the jury thought was foreseeable to Trinidad.

-11-

Under the guidelines, Trinidad is responsible for the entire $2 million only to the extent that he could foresee that Colon was using this single conspiracy or joint undertaking to launder all of his drug money (why this would be so or even likely is unclear) or, perhaps more plausibly, that the specific conspiracy or joint undertaking <u>in which he (Trinidad) was involved</u> was large enough to encompass $2 million.  <u>See</u> U.S.S.G. § 1B1.3. Evidence in the present record, or otherwise, may bear on this question (possibilities are suggested above); but the burden of proof is on the government and we have not yet been pointed to the necessary evidence.

Trinidad also challenges the sentencing court's ruling that he was not entitled to a downward departure for aberrant behavior.  A denial of a downward departure is generally non-reviewable.  <u>See</u> <u>United States</u> v. <u>Pierro</u>, 32 F.3d 611, 619 (1st Cir. 1994), <u>cert. denied</u>, 513 U.S. 1119 (1995).  The exception to this rule are cases in which the lower court's failure to depart stemmed from a misapprehension of its authority under the guidelines.  <u>Id.</u>  Here, Trinidad argues that the district court did misunderstand its authority under the guideline in question.

The pertinent guideline provides: "A sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior. . . ."  U.S.S.G. § 5K2.20.  There are certain categorical

-12-

exclusions (e.g., for a defendant with a prior conviction) but apparently they are not applicable to Trinidad. The commentary adds this:

> "Aberrant behavior" means a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life.

Id., comment. (n.1). It also lists some non-exclusive factors that may bear on the discretionary choice.[3]

In denying Trinidad's request for a downward departure, the trial court said that it was not authorized to grant a downward departure on the present facts until there is a "clear indiction" that a "combination" of elements was sufficient to justify a departure. The district court did not spell out what it meant; but a controversy under this rubric ("combination of factors") pre-existed this guideline, was the subject of case law, and is addressed in the guideline's history. Almost certainly this is the context for the district court's reference.

Until the November 2000 edition of the guidelines, no guideline specifically addressed aberrant behavior. Instead, case law developed, pearl-like, around a single longstanding sentence in

---

[3]"In determining whether the court should depart on the basis of aberrant behavior, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." Id. comment (n.2).

-13-

an introductory comment to the effect that departures were not precluded for "single acts of aberrant behavior." See U.S.S.G. ch. 1 pt. (A)(4)(d) (2000). Case law, referred to in the amendment that added section 5K2.20 to the 2000 edition of the guidelines, had produced a splintering of views among the circuits as to how strictly the phrase "single act" should be read; some courts looked for a single and spontaneous occurrence; others, including this circuit, rejected any very narrow requirement, saying that aberrancy should be based upon a totality of the circumstances. See U.S.S.G. App. C 603; United States v. Grandmaison, 77 F.3d 555, 563 (1st Cir. 1996).

In the 2000 amendment adding section 5k2.20, the Commission declared that "the amendment addresses the circuit conflict but does not adopt in toto either the majority or minority circuit view on this issue." U.S.S.G. App. C 603. Instead, taking together the new guideline itself, its commentary, and the amendment's lengthy "reason for amendment," the Commission adopted what is effectively a multi-part scheme: first, the defendant must meet all of the express qualifications in application note 1 (the indented text quoted above) and not be excluded by any of the express exclusions in the guideline itself (which are here irrelevant); and second, once aberrant behavior is found to exist, the court may weigh a series of considerations including those

specifically identified (non-exclusively) in application note 2 (quoted above in the footnote).

Further, the "reasons for amendment" make clear that the Commission intended "to relax slightly" the very strict view taken by some circuits as to the requirement of a single act but to reject the "totality of circumstances" approach adopted by other circuits as "overly broad and vague." Id. The first purpose was served by adopting in place of "simple act" the phrases "single criminal occurrence and "single criminal transaction," with the caution that they be limited to offenses with all three characteristics set forth in application note 1. Id. The second purpose was served by the structured requirement of application note 1 (and by the exclusions in the guideline itself).

Presumably, the Commission appreciated that the third required characteristic--"marked deviation . . . from an otherwise law-abiding life"--is itself quite open-ended. But the first two are not open-ended: they require a lack of significant planning and limited duration. It is impossible to see how Trinidad's conduct, which embraced a reasonably elaborate scheme of multiple deposits and transfers in the first transaction (Budweiser) followed later by two more transactions (the second boat and the unsuccessful apartment purchase) could be called a "single" criminal occurrence or transaction done without significant planning and of limited duration. Even if we assume arguendo that the Budweiser scheme

alone might barely qualify, Trinidad's continued engagement was hardly of limited duration.

Thus, whatever the district court meant by its remark, the downward departure was not available to Trinidad. In all likelihood, the court meant that until the current guideline is changed, the totality of the circumstances test--in the sense intended by our pre-amendment decision in Grandmaison, is not available. In this, the district court is certainly right. Grandmaison and cases like it do survive the amendment but only in a limited and different respect, namely, in the slight relaxation of the "single act" requirement--a relaxation itself not sufficient to embrace Trinidad's multiple transactions. Of course, depending on the government's foreseeability evidence, he may still end up with a lighter sentence.

Rivera. Basilio Rivera-Rodriguez operated a business called BVF Construction. The government's evidence focused on a set of transactions made by Colon and Rivera through that business. In the first of these, which took place in June 1995, Colon gave Rivera upwards of $105,000 (of which $89,000 was in cash) to deposit in a BVF bank account. Rivera then purchased a manager's check in the amount of $105,000, which was then given to a boat company--with other compensation--as payment for a 46-foot racing boat. Colon then took possession of the boat. Later, in November,

Rivera wrote checks from the BVF account to Colon for $2,900 in unspecified boat expenses.

In the second set of transactions, Colon in August 1995 wrote a check to BVF Construction for $130,000. On the same day, Colon's father wrote a check for $65,000 to BVF, drawing upon his son's drug money. This money was deposited in a BVF account, where it stayed, untouched, until November 1995, when Rivera wrote checks to Colon for nearly the full amount deposited--$192,900.

The government argues that Rivera's BVF corporation effectively served as a clearing house for Colon's drug funds. Thus, when Colon decided to purchase the boat, he did it with money channeled through BVF so as to muddy the trail of the purchase. Similarly, by depositing $195,000 in the BVF account and withdrawing it later, the government argues that Colon hoped to give that money a patina of legitimacy.

At trial, inconsistent stories were told as to the purpose of the transactions. Colon testified that he had given funds to BVF to invest in the construction of ATM bank branches, and that he then withdrew some of the funds when he needed to make other purchases. Colon admitted that no bank branches were ever built. Evidence was also given that Rivera--who did not testify at trial--had said in a deposition in a civil case that the payments to Colon were for labor that Colon had performed. But again, Colon testified that he had never performed any labor for Rivera or BVF.

-17-

Rivera objects on appeal that there was no evidence that he conspired or that he knew that the transactions were intended to disguise the source of funds or that he knew that the funds were the proceeds of drug dealing or any other unlawful activity. On the contrary, the pattern was a classic example of money laundering. See United States v. Martinez-Medina, 279 F.3d 105, 116 (1st Cir. 2002); B. Williams & F. Whitney, Federal Money Laundering: Crimes and Forfeitures § 5.1.6.11, at 167 (1999).

In one case, a huge cash payment into a business, for no demonstrated legitimate reason, was followed by the use of the funds to purchase property for the original depositor. In the other case, an outsider's money was run into the business and then backed out to the depositor, again with no apparent reason except to provide a seemingly legitimate source.

From these facts, a reasonable jury could conclude that the obvious, and only plausible, explanation was that Colon was trying to disguise the origin of his proceeds by making it appear that the money had come to him from a legitimate business; that the obvious explanation for this conduct was that the funds were illegally derived, most likely from drug dealing; and that these facts were necessarily apparent to Rivera. As for "conspiracy," an agreement between Colon and Rivera can plainly be inferred from the fact that the transactions occurred at all, even though the conversations and quid pro quo are unknown to us.

-18-

Of course, payments by anyone--including a drug dealer--to a business and payments back out may be legitimate in context: Colon could have sent a check to a mutual fund and received dividends in exchange.  It is the details--the cash, the near equivalence of dollars in and out, and above all the lack of legitimate motive--that distinguish this case.  E.g., United States v. Carr, 25 F.3d 1194, 1203 (3d Cir. 1994), cert. denied, 513 U.S. 939 (1994).  It is not logically impossible for there to have been some legitimate explanation for the transactions; but one who is caught with a smoking gun and a dead victim can hardly complain if, absent some explanation, the jury draws the natural inferences from the facts.

In addition to challenging the sufficiency of the evidence, Rivera makes several other claims.  First, he contends that the trial court failed to give a limiting instruction to the jury with respect to the testimony of a government witness, Nelson Biaggi.  Biaggi was the attorney for the bank where BVF Construction kept its accounts.  Rivera had previously sued the bank, and Biaggi was present at a deposition in that case where Rivera made statements relevant to this prosecution.  On appeal, Rivera claims that the judge should have instructed the jury as to Biaggi's pecuniary interest in the outcome of Rivera's criminal case.

Although Rivera (unsuccessfully) objected to Biaggi's testimony when he testified, his counsel never asked the judge to charge the jury regarding the testimony. As such, we review the failure to give the instruction only for plain error. United States v. Vega-Figueroa, 234 F.3d 744, 757 (1st Cir. 2000). No error, let alone a plain one, occurred here. Rivera presents no evidence here that Biaggi would have profited from Rivera's conviction, and the trial judge stated at the sentencing hearing that he found that no such link was present. Rivera's citation to United States v. Frank, 494 F.2d 145 (2d Cir.), cert. denied 419 U.S. 828 (1974), is inapposite: there, the witness in a criminal case was the plaintiff in a related pending civil case against the defendant and so stood to gain from his testimony. Id. at 158-59.

Rivera also challenges--in a three sentence argument-- the decision of the trial judge to proceed with the sentencing hearing despite the fact that only Rivera's sentencing attorney, and not his trial attorney, was present. Although represented, Rivera apparently did not object to this decision below and thus the test is again plain error. In all events, Rivera neither explains how he was prejudiced nor points us to case law supporting his position. This cursory treatment of the issue amounts to a

forfeit.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), cert. denied, 474 U.S. 1082 (1990).[4]

Finally, Rivera argues that the district court erred by declining to give him a downward departure for aberrant behavior and a downward adjustment for being a minor participant under U.S.S.G. sections 5K2.20 and 3b1.2, respectively, and by applying a five-level enhancement based on the amount of laundered funds pursuant to § 2S1.1(b).  None of these claims was raised at the sentencing hearing, and so we review only for plain error.

The district court's refusal to allow a downward departure for aberrant behavior is quickly dealt with:  we may review such a decision only if "the district court acted in the mistaken belief that it lacked the ability to depart."  See United States v. Pierro, 32 F.3d 611, 619 (1st Cir. 1994).  The transcript of the sentencing hearing shows that the judge explicitly stated that he understood that he had the authority to depart but concluded that the departure was not warranted.  As for the refusal to grant a downward adjustment for minor participant status, the district court found that Rivera was one of "the prime sources" of the money laundering and Rivera fails to show why this was error, let alone plain error.

---

[4]His counsel at sentencing did complain that he had not seen a copy of the pre-sentence report but apparently the court pointed out that it had been sent to trial counsel and counsel at sentencing made no request for an adjournment.

As for upward adjustments in offense level, there was a three-level adjustment because Rivera knew or believed that drug proceeds were involved, U.S.S.G. § 2S1.1(b)(1), and a further two-level increase because the amount exceeded $200,000. Id. § 2S1.1(b)(2)(C). Plain error aside, we think (for reasons indicated above) that Rivera did know or believe that drug funds were involved. As to amount, Rivera--unlike Trinidad--was held liable only for the amount that passed through the BVF Construction accounts.

Trindad's conviction is affirmed but his sentence is vacated and the matter remanded for resentencing consistent with this opinion. Rivera's conviction and sentence are both affirmed.

It is so ordered.