# United States Court of Appeals
## For the First Circuit

No. 07-2126

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN CEDEÑO-PÉREZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Lynch, Chief Judge,
Leval,* and Lipez, Circuit Judges.

Juan J. Hernández López de Victoria for appellant.
Timothy R. Henwood, Assistant United States Attorney, with
whom Nelson Pérez-Sosa, Assistant United States Attorney, and Rosa
Emilia Rodriguez-Velez, United States Attorney, were on brief, for
appellee.

August 26, 2009

*Of the Second Circuit, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>.** After delivering more than $200,000 to an Immigrations and Customs Enforcement ("ICE") agent posing as a money launderer, Juan Cedeño-Pérez ("Cedeño") was charged with conspiracy to commit money laundering. At trial, the government presented evidence from a confidential informant who ran the money laundering operation, the ICE agent who accepted the money from Cedeño, and others involved in the investigation. Cedeño was convicted. He moved for a judgment of acquittal at all appropriate times, arguing that the evidence was insufficient to establish that he possessed the mental state required for conspiracy to commit money laundering. The court denied the motion, and Cedeño appealed. We affirm.

I.

## A. Factual Background

In a sufficiency challenge, we state the facts in the light most favorable to the verdict. <u>United States</u> v. <u>Upton</u>, 559 F.3d 3, 6 (1st Cir. 2009).

In 2003 and 2004, ICE investigated drug trafficking and money laundering conducted by the Toloza family of Colombia. Acting in conjunction with confidential informant Werner Romero, ICE agents in Puerto Rico posed as money launderers for the Tolozas, and accepted deliveries of large quantities of cash resulting from payments for the Tolozas' drugs. ICE deposited the money in bank accounts provided by the Tolozas, from which it was

withdrawn inside Colombia.[1]  Transfer through the accounts was intended to remove the "taint" of drug trafficking.  See United States v. Torres-Velazquez, 480 F.3d 100, 102 (1st Cir. 2007) (describing the Toloza money-laundering scheme).

Romero received money laundering "contracts" directly from "Juanito" Toloza, a member of the Toloza family.  Juanito would call Romero, ask if he was willing to transfer money from Puerto Rico to Colombia, and then provide a phone number for the individual who would deliver the cash.  Romero would then contact the deliverer and use code words to communicate that he was the intended recipient of the money.  For example, Romero would identify himself on the phone as "Ricardo, on behalf of Juanito." In other cases, code numbers were used.  Romero and the deliverer would then agree on a meeting place to transfer the money, sometimes also using code words.  Meetings were usually in public places, such as parking lots, to ensure safety.

On August 4, 2003, undercover ICE agent Luis Ortiz, posing as a money launderer and an associate of Romero, contacted Cedeño through a phone number provided to Romero by Juanito

---

[1]  Although the record does not explain why the government was willing to have the illegal proceeds in its possession ultimately withdrawn by the Toloza family from the bank accounts into which they were deposited, we assume that the government determined that this step was necessary to establish the involvement of all the defendants in this large conspiracy, including the Tolozas themselves.  See infra section II.

Toloza.[2]  Ortiz identified himself as calling "on behalf of Ricardo," which was, he testified, "the code [Cedeño] [wa]s waiting for to know that [it wa]s the correct person calling him."  Cedeño responded that he had spoken with "Ricardo," and told Ortiz that the "documents" were ready for delivery.  As Ortiz described, "[w]e don't talk about currency like that on the phone. . . .  [A]lmost everybody that deals with this kind of business knows the documents are currency."  Ortiz told Cedeño that he had to receive the currency before 2 p.m., because "I can't stay through the night with that."  As Ortiz later explained, the money had to be transferred early enough to be deposited in a bank the same day, or he would have to "watch" the currency through the night.  Cedeño and Ortiz then agreed on a location to make the transfer.  After Cedeño suggested a particular location, Ortiz told him, "the area there, the sun is a little hot over there," using coded language to indicate a heightened police presence.  Cedeño then agreed to transfer the money at a different location, the Home Depot parking lot in Plaza Escorial.

Sometime later that day, Ortiz learned from Romero that Cedeño was trying to reach him.  Ortiz then called Cedeño, who told him that he would be delayed.  Ortiz responded that he was "not going to wait there long.  You know how this is."

---

[2]  ICE recorded this phone call, as well as two others between Ortiz and Cedeño, and the recordings were played at trial.

Meanwhile, Puerto Rico police discovered an abandoned car in the parking lot where Cedeño and Ortiz had agreed to meet.[3] When Cedeño arrived, he became unsettled by the presence of the police. He told Ortiz, "Let's get out of here. Let's get out of here." Ortiz responded that Cedeño should "calm down," and pointed out that the police were occupied by the car and would not notice the money transfer. Still, Cedeño was uncertain about proceeding. After walking around the mall parking lot, he returned and asked Ortiz, "Are we going to do it here, or are we going to leave out of here [sic]?" Ortiz again tried to reassure Cedeño that they could make the transfer. Cedeño went to his car, and began taking a bag out of his trunk. He appeared scared. He asked Ortiz, "Can I do it now?" Ortiz said yes, and Cedeño brought the bag to Ortiz's car. Ortiz asked him if he had "checked this," and Cedeño said that he had. Inside the bag was $200,094, in twenty, ten, five, and one-dollar denominations, bound together with rubber bands and plastic straps. Ortiz left with the currency.

Sometime later, Ortiz and Cedeño spoke again on the phone. Ortiz told Cedeño that "everything [wa]s fine," and that he had "already arrived." Cedeño responded, "Okay, my brother," and said, "I am going to call that man now. My man." As Ortiz explained at trial, deliverers typically notify their "bosses" that

---

[3] Puerto Rico police officers who discovered the car were not working with ICE and apparently had no knowledge of the planned meeting.

the delivery occurred and that they are no longer responsible for the currency.  Federal agents arrested Cedeño on October 15, 2004.

**B. Proceedings in the District Court**

On September 27, 2004, a federal grand jury returned a sealed indictment charging twenty-four individuals with conspiracy to commit money laundering, conspiracy to possess with intent to distribute narcotics, and several forfeiture charges.  Cedeño was named in Count I, conspiracy to commit money laundering, and Count III, a forfeiture charge.  The indictment charged Cedeño with conspiring to commit two "modalities" of money laundering, "promotional" money laundering and "concealment" money laundering. See United States v. Iacaboni, 363 F.3d 1, 4 n.7 (1st Cir. 2004).

A person commits "promotional" money laundering if, (1) "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity," he (2) "conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity," (3) "with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(1)(A)(i).  In "concealment" money laundering, only element (3) differs: the person conducts the financial transaction "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or

-6-

the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956 (a)(1)(B)(i).

During a three-day trial involving only Cedeño in February 2007, the government presented four witnesses, including Romero and Ortiz, and two other government agents. At the close of the government's case, Cedeño moved for judgment of acquittal, which the court denied. See Fed. R. Crim. P. 29(a). The defense presented no witnesses and then renewed its motion for judgment of acquittal, which was again denied. On the government's motion, the court dismissed the forfeiture count. The jury was instructed on conspiracy to commit money laundering, and was given a willful blindness instruction. See United States v. Rivera-Rodríguez, 318 F.3d 268, 271 (1st Cir. 2003). It returned a verdict of guilty.

On February 23, 2007, Cedeño renewed his motion for judgment of acquittal and, in the alternative, moved for a new trial under Federal Rule of Criminal Procedure 33. He argued, inter alia, that the evidence presented at trial was insufficient to prove that he both (1) knew that the money involved in the August 4, 2003 transaction was the "proceeds of some form of unlawful activity," and (2) either (as required for "promotional" money laundering) intended to promote the carrying on of that activity, or (as required for "concealment" money laundering) knew that the transaction was designed "to conceal or disguise the

nature, the location, the source, the ownership, or the control of the proceeds."

The district court denied Cedeño's motion. It held that a rational jury could have concluded that both required mental states had been established beyond a reasonable doubt. First, in light of the fact that the defendant "delivered a large amount of cash, a bag full of approximately $200,000 in small denominations, at a shopping mall parking [lot]," and used code words to establish a time and place to hand over the money, a rational jury could conclude beyond a reasonable doubt that Cedeño knew he was handling money derived from an illegal activity. Second, in light of the large amount of money, the small-denomination bills, the telephone conversations about the time and place of delivery, and Cedeño's anxiety about police activity at the delivery, a rational jury could conclude, beyond a reasonable doubt, that Cedeño knew the transaction was "meant to conceal the origin and nature of the funds he delivered, and that his actions were intended to promote unlawful activity."

Cedeño now appeals. His sole argument on appeal is again that the evidence was insufficient to prove that he possessed the mental states required for a conviction of conspiracy to commit money laundering.

**II.**

To determine whether the evidence is sufficient to sustain a conviction, we ask "whether the evidence, viewed in the light most favorable to the prosecution, would permit a rational jury to find each essential element of the crime charged beyond a reasonable doubt." United States v. Frigerio-Migiano, 254 F.3d 30, 33 (1st Cir. 2001) (quotation marks and citation omitted). We consider the evidence as a whole, as well as "reasonable inferences" that jurors "may draw . . . from the evidence based on shared perceptions and understandings of the habits, practices, and inclinations of human beings." United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998) (quotation marks and citation omitted).

Here, to obtain a conviction for conspiracy to commit money laundering, the government had to establish the existence of two mental states: (A) Cedeño's knowledge that the money transferred on August 4, 2003 "represent[ed] the proceeds of some form of unlawful activity"; and (B) Cedeño's "intent to promote" that unlawful activity, or his knowledge that the transaction was "designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." See 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i); see also Frigerio-Migiano,

254 F.3d at 33 (describing the "twofold" "knowledge requirement" for money laundering).[4]

In the alternative, the government could have established Cedeño's guilt by proving that he was willfully blind to the facts constituting the offense. Although the district court instructed the jury on willful blindness, we do not reach Cedeño's argument that the evidence was insufficient to establish willful blindness, because we conclude that a rational jury could find that Cedeño knew that the money he transferred derived from unlawful activity.

## A. Proceeds of an Unlawful Activity

In arguing that the evidence presented at trial did not establish that he knew the unlawful origin of the money transferred in the August 4, 2003 transaction, Cedeño points out that he did not discuss the money's origin during any of the telephone calls with Ortiz, and that the ICE investigation did not reveal the origin of the money. Cedeño also argues that his connection with the money laundering scheme was attenuated; Romero testified that he was uncertain if he had spoken with Cedeño, and that the Toloza family was unfamiliar with him.

---

[4] Although Cedeño was charged with conspiracy to commit money laundering under 18 U.S.C. § 1956(h), we have previously held that to sustain a conviction for conspiracy to commit money laundering, the evidence must show that the defendant possessed the mental state required for the substantive offense. See United States v. Corchado-Peralta, 318 F.3d 255, 257, 258 n.2 (1st Cir. 2003); Frigerio-Migiano, 254 F.3d at 33.

A conviction for money laundering does not require that the defendant know the precise origin of the property transferred, but only that it came "from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law." 18 U.S.C. § 1956(c)(1) (defining the phrase "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity"); accord Corchado-Peralta, 318 F.3d at 258. Here, as Ortiz described, Cedeño recognized and used code words to identify the intended recipients of the money, Romero and Ortiz. In particular, he used the expression "documents" to conceal the fact that he was delivering currency. Cedeño agreed to avoid a drop off location that was "hot," or too close to police activity. During the drop off Cedeño became "excited" and "kind of scared" by the presence of the police in the parking lot. He told Ortiz that they should "get out of here." When Ortiz finally convinced him to transfer the money despite the police presence, Cedeño asked Ortiz, "Can I do it now?," further reflecting his desire to avoid police detection. Cedeño knew that the plastic bag he transferred contained $200,000 in mixed small-denomination bills. Romero testified at trial that only "a trusted person," an "employee[], part of the chain," would be assigned to deliver that much money, since others would steal it. The jury heard a phone call in which Cedeño told Ortiz that he had spoken with "Ricardo," Romero's money-laundering alias.

-11-

From this evidence, a rational jury could have concluded, beyond a reasonable doubt, that Cedeño knew that the money came from some form of unlawful activity. The jury could have reasoned that Cedeño's use of code words and his concern about police detection reflected an awareness that the currency he was transferring derived from unlawful activity. This inference would have been strengthened by the large amount of currency, the small-denomination bills, their storage in a plastic bag, and the transfer in a parking lot, all of which the jury could have reasonably regarded as suggesting unlawful activity. See Frigerio-Migiano, 254 F.3d at 33-34 (noting evidence that defendant witnessed deliveries of "large amounts of small-denomination cash" and issued coded receipts for these deliveries). Lastly, from Romero's testimony that only a "trusted person" would make such a delivery, and Cedeño's statement that he had spoken to "Ricardo," the jury could have reasoned that it was likely that Cedeño knew something about the unlawful nature of the Toloza family's activities and that the transferred money was in payment for those activities.

## B. Promotion or Concealment

The district court held correctly that the government had to prove the mental state for either "promotional" or "concealment" money laundering to obtain a conviction on the indictment. See United States v. Garcia-Torres, 341 F.3d 61, 66 (1st Cir. 2003)

-12-

("[W]here an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means . . . ." (quotation marks and citation omitted)). Therefore, the conviction must be affirmed if the government presented evidence sufficient to prove that Cedeño possessed either the mental state required for "promotional" money laundering or the mental state required for "concealment" money laundering. Without suggesting that the evidence was insufficient to prove "promotional" money laundering, we focus on the charge of "concealment" money laundering.

In support of his claim that the evidence was insufficient to prove that he knew that the August 4, 2003 transaction was designed to conceal the nature, location, source, ownership, or control of the money, Cedeño points out that he did not instruct Ortiz to deposit the money in a bank account or to purchase real estate -- methods associated with laundering money. Nor did he "mention anything" to Ortiz about concealing the transferred funds. Lastly, ICE encountered Cedeño only once during the course of its investigation into the Tolozas, and, as discussed above, Cedeño was not known to the Toloza family.

We disagree with this assessment of the evidence. The jury's conclusion that Cedeño knew the transaction was "designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of the money is well

-13-

supported by the evidence. Our conclusion is guided by the Supreme Court's recent interpretation of the same language in Cuellar v. United States, 128 S. Ct. 1994 (2008), where the Court dealt with the transportation provision of the money laundering statute. Under the "transportation" provision, it is unlawful to transport money outside the United States "knowing that [the money] involved in the transportation . . . represent[s] the proceeds of some form of unlawful activity" and that "such transportation . . . is designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of the money. 18 U.S.C. § 1956(a)(2)(B)(i) (emphasis added). In the context of the money laundering statute, the Court said, "'design' means purpose or plan; i.e., the intended aim of the transportation." Cuellar, 128 S. Ct. at 2003. Thus, to obtain a conviction, the evidence had to show that the purpose of the transportation was to conceal the funds, not simply that the funds had been concealed during transportation.[5] Id. at 2005-06.

Because the Court's reasoning turns on the plain meaning of the statutory text, and because the text of the design element

---

[5] The Court in Cuellar found the evidence insufficient to convict the defendant of "transportation" money laundering because, although the evidence showed that the defendant engaged in secretive conduct to facilitate his transportation of money to Mexico, the evidence did not show that "secrecy was the purpose of the transportation." 128 S. Ct. at 2005. In short, "the Government failed to introduce any evidence that the reason drug smugglers move money to Mexico is to conceal or disguise a listed attribute of the funds." Id.

-14-

of the transportation provision is identical to the text of the design element of the transactional provision of the money laundering statute at issue here, we apply that reasoning to the facts of this case. Thus, to obtain a conviction for "concealment" money laundering, the evidence must show that the purpose of the financial transaction is to conceal the nature, location, source, ownership, or control of the transacted proceeds.

The Court wrote in Cuellar that "where the consequences of an action are commonly known, a trier of fact will often infer that the person taking the action knew what the consequences would be and acted with the purpose of bringing them about." Id. at 2005 n.8; see also 1 Wayne R. LaFave, Substantive Criminal Law § 5.2, 5.2(a) (2d ed. 2008) (describing this inference). Here, instead of transportation, the underlying criminal conduct is a financial transaction involving the proceeds of an unlawful activity. See 18 U.S.C. § 1956(a)(1). A rational jury could have concluded that Cedeño, in agreeing to carry out a financial transaction with Ortiz, engaged in conduct that was commonly known to conceal the nature, location, source, ownership, or control of the proceeds.

For example, Cedeño employed code words to identify callers and to establish a meeting location free of police presence. He packaged the money in a bag, kept the bag in his trunk, and delivered it in a mall parking lot, which had the effect of hiding the money and rendering the transaction relatively

-15-

inconspicious.  A rational jury could have reasoned that, since it is commonly known that engaging in such conduct would have the effect of concealing the location, source, ownership or control of the money being transferred, it was Cedeño's purpose in so acting to conceal those traits of the proceeds.  See also Corchado-Peralta, 318 F.3d at 259 (holding the evidence was insufficient where "nothing about [the defendant's conduct] points toward concealment or disguise").

This conclusion is supported by other evidence as well, including some of the same evidence that showed Cedeño's knowledge of the unlawful source of the funds.  First, during the transaction with Ortiz, Cedeño repeatedly expressed concern that the money be handed over without alerting the police.  He was reluctant to take the bag out of his car, and would not do so until Ortiz told him it was safe.  Second, Ortiz testified that he told Cedeño he needed to receive the money before 2 p.m., because he did not want to "stay through the night" with it.[6]  The jury could have concluded that Cedeño knew that Ortiz was going to deposit the money in a bank. In light of this, the jury could have further concluded that Cedeño understood that the highly secretive transfer in the parking lot was designed to conceal from the authorities the origin of the money Ortiz was to deposit; otherwise, there would have been no

---

[6]     The parties did not discuss this testimony in their briefs.

reason not to wire, or publicly deliver, the money to Ortiz.  In short, there was ample evidence to support the jury's verdict that Cedeño knew the financial transaction with Ortiz was "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds."  18 U.S.C. § 1956(a)(1)(B)(i).

Affirmed.